ELY, Circuit Judge
(dissenting):
I respectfully dissent. I am convinced that, contrary to the majority’s conclusion, the Bankruptcy Court’s findings and conclusions were correct and that the District Court’s judgment should be reversed.
The initial portion of the majority opinion concerns the proper standard of review of the Bankruptcy Court’s findings and conclusions. Implicit in this discussion is the conclusion, I believe, that we should review the Bankruptcy Court’s findings directly and should not undertake some type of review of the District Court’s conclusions. I do not wholly agree with this approach. If a District Court’s conclusions of law are wrong, then we should correct them. Although the majority does not reach the point, I believe that the Bankruptcy Court’s findings and conclusions can and should be upheld under both standards, the clearly erroneous standard and the contrary to law standard.
It is clear to me that the Bankruptcy Court applied the correct legal standards and that its factual findings pursuant to those legal standards were not clearly erroneous. The correct legal standards are: (1) was the liquidated damages clause the result of a reasonable effort by both parties to estimate the actual damages that might be sustained by the Government, and (2) was the liquidated damages clause in fact a reasonable forecast of just compensation of harm to the Government? The first inquiry focuses on the facts surrounding the negotiation of the contract; the second involves an “objective” comparison of the liquidated damages and the nature of the contract. Although my colleagues cite the applicable Supreme Court decision, Priebe & Sons, Inc. v. United States, they focus only on the issue of whether the damages clause was “reasonable.” This issue is only a part of the overall inquiry that should be made. See Higgs v. United States, 546 F.2d 373, 377 (Ct.Cl.1976).
The Bankruptcy Court made findings of fact, which cannot be contested as clearly erroneous, that support its conclusion that the parties did not make a reasonable effort to estimate the actual damages to the Government in arriving at the damages clause. That court found as facts that: the contract was drafted by the Government; the Government admitted that $2500 was an “arbitrary” figure; the Government told Bubble Up that this was “the figure we need to have”; there were no conversations between the contracting parties about what a reasonable figure might be; the parties did not consider the nature of the various breaches that could occur; and the Government’s evidence was that its intent in amending the contract was to “be pretty tough” with Bubble Up and that it considered the damages clause as a penalty clause. Particularly damaging was the testimony of the negotiators for the Government.[1]
*1266 The majority refers to none of these findings and ignores the requirement that a liquidated damages clause be the result of a reasonable attempt by both parties to estimate actual damages. See Priebe & Sons, 332 U.S. at 411, 68 S.Ct. at 125-26.
The damages clause also falls when considered on its face in comparison to the nature of the contract. This is the only approach taken by the majority, and it concludes that “a finer calibration is not necessary” when the Government has bargained for the employment of a certain number of people for a certain amount of time. I believe, however, that the law pertaining to liquidated damages does require a finer calibration. A flat sum that is imposed on the condition that the Government did not get a full 100% of its bargain seems to be the classic case of a penalty clause. Here the Government imposed a flat sum for each employee that Bubble Up had failed to employ for at least 9 months (6 months in the original contract). The flat sum fails to account for benefits accruing to the Government when Bubble Up employed someone for 8 months and 29 days. In fact, as the parties agree, Bubble Up could have employed all 300 employees, each for 8 months and 29 days, and still have been liable for the full amount of liquidated damages.
Moreover, the Bankruptcy Court cited evidence which established that the $2500 figure was not an accurate amount. And probably the most critical evidence showing that the damages clause was not related to any reasonable estimate of actual injury is the change between the original and the amended contract. In the amended contract the Government increased the minimum time periods and the minimum number of persons that Bubble Up was required to employ, yet the damages figure remained the same. Under the original contract Bubble Up could have employed 300 persons for 7 months each, and the Government would have received what it bargained for; under the amended contract, the Government would have been “damaged” in the full amount of the liquidated damages clause: $75,000. The testimony by the government negotiator clearly shows that the Government raised the minimum employment requirements not because it was bargaining for a better deal, but because it thought the increases were “a better indication of (Bubble Up’s) willingness to perform.”
In sum, all the facts show that the Government insisted on the damages clause, and the more stringent requirements of the amended contract, as a means of encouraging Bubble Up’s compliance with the contract. This is the essence of a damages clause that is a penalty: when a provision “was included not to make a fair estimate of damages to be suffered but to serve only as an added spur to performance^] ... courts do not give their imprimatur to such arrangements.” Priebe & Sons, Inc., 332 U.S. at 413, 68 S.Ct. at 126. See also In re Plywood Co. of Pa., 425 F.2d 151, 155 (3d Cir. 1970); Brecher v. Laikin, 430 F.Supp. 103, 106 (S.D.N.Y.1977).
I would uphold the Bankruptcy Court and reverse the judgment of the District Court.

. Mr. Ruttenberg, the Government’s chief negotiator, gave the following instructions to his associates regarding “negotiating” the Amended Contract:
“I said to them that, inasmuch as Bubble Up had been given two or three chances, had failed on each occasion to perform but yet had received over two-thirds of a million dollars, that we had to be pretty tough with Bubble Up and that we ought to go in there with the attitude that we’re going to cancel the contract and exercise the penalty clause and cause repayment to be made for all 275 workers that were not employed....
“But I said, ‘Let’s make it tougher on them. Let’s increase the number of workers we’re going to require them to employ, and let’s increase the duration that they have to retain those people on their payroll, and that if Bubble Up isn’t willing to accept those conditions, then forget about it and let’s exercise our right to cancel the contract, if they’re not performing.’ ”
Mr. Ruttenberg’s associates, Messrs. Granak-is and Guttman, carried out his instructions at the meeting with Mr. Key in Los Angeles which resulted in the Amended Contract. Mr. Gra-nakis testified that:
(a) He threatened Bubble Up with termination of the Original Contract.
(b) The increase from 275 to 300 employees was insisted upon by the Government as *1266 a “better indication of (Bubble Up’s) willingness to perform.”
(c) The increase in duration of employment from 6 to 9 months was insisted upon by the Government as proof of good faith.
Mr. Guttman added:
(a)The Government was going to make the Amended Contract more stringent than the Original Contract
(b) “(T)he nine-month period is, we were going to get somewhat more for our money than we had gotten before.”
(c) “I can tell you the general context is that we were going to get more definite, more tough, and try to protect the government’s interests better than they had been in the (Original Contract).”